[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 6, 2006
THOMAS K. KAHN
CLERK

No. 04-11283

D.C. Docket No. 02-00721-CR-13-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

AMADOU FALL NDIAYE,
MALENE DIAW,
AGUNG SUMBODO,
EMMANUEL AIMASIKO,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Georgia

**(January 6, 2006)**

Before TJOFLAT and KRAVITCH, Circuit Judges, and MILLS,[*] District Judge.

MILLS, District Judge:

We deal here with illegal aliens and Social Security fraud.

Of the original 28 defendants indicted, we are concerned with only four of them: Ndiaye, Sumbodo, Aimasiko and Diaw.

The copious and voluminous record here lays the case before us, including a three-week jury trial and a sentencing hearing.

In sum, we affirm.

## I. INTRODUCTION

On November 20, 2002, a grand jury returned an indictment charging Amadou Fall Ndiaye, Agung Sumbodo, Emmanuel Aimasiko, Malene Diaw and 24 other defendants with violating 18 U.S.C. § 371 by a conspiracy to commit identification documentation fraud and Social Security fraud, in violation of 18 U.S.C. § 1028(a)(1), (2) and (6) and 42 U.S.C. § 408(a)(6); and conspiracy to encourage and induce aliens to unlawfully enter and reside illegally in the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv). Aimasiko, Ndiaye, and Sumbodo were also charged with substantive counts of encouraging and inducing aliens to reside illegally in the

_____

[*]Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

2

United States, in violation of § 1324(a)(1)(A)(iv) (Counts 20, 27, and 28). Sumbodo and Diaw were also charged with substantive counts of making false statements in an application for a Social Security number, in violation of 18 U.S.C. § 1001(a) (Counts 4 and 6).

On February 18, 2003, the Government filed a superseding indictment alleging 41 counts against the same 28 defendants. The charges against these four individuals remained the same.

The jury trial began on October 27, 2003. On November 18, 2003, guilty verdicts were returned against all four defendants. Diaw and Sumbodo were convicted of all crimes with which they were charged. Ndiaye and Aimasiko were convicted of conspiracy and acquitted of encouraging and inducing an alien to reside in the United States.

The district court imposed the following sentences:

(1) Ndiaye was sentenced to 15 months imprisonment for one count of conspiring to commit identification document fraud and Social Security fraud, in violation of 18 U.S.C. § 371;

(2) Sumbodo was sentenced to 44 months for one count of conspiring to commit Social Security fraud and immigration fraud, in violation of § 371, one count of making false statements on Social Security applications, in violation of 18 U.S.C.

3

§ 1001(a), and one count of encouraging aliens to reside in the United States, in violation of 18 U.S.C. § 1324(a)(1)(A)(iv) and 18 U.S.C. § 2;

(3) Aimasiko was sentenced to 21 months for one count of conspiring to commit Social Security fraud and immigration fraud, in violation of § 371; and

(4) Diaw was sentenced to 18 months for one count of conspiracy to commit Social Security fraud and immigration fraud, in violation of § 371, and one count of making false statements on Social Security applications, in violation of § 1001(a).

All four defendants filed timely notices of appeal. Diaw has served her sentence and been deported. Ndiaye is on bond pending appeal. Aimasiko and Sumbodo were serving their sentences at the time the briefs were filed in this appeal. For the reasons given herein, we affirm the Appellants' convictions and sentences.

## II. FACTS

The Government alleges that Matar Fall, who was also indicted and was the ringleader of the conspiracy involving Sumbodo, Diaw (Fall's wife), Ndiaye and Aimasiko, paid a Social Security Administration employee, Celestine Huger, to fraudulently issue Social Security numbers to aliens who were not legally entitled to them. Huger worked as a claims clerk at the Social Security Administration. She would process the Social Security number applications based on fraudulent immigration documents, including visas and accompanying documents, provided by

4

Fall. Sumbodo and Diaw also fraudulently obtained a Social Security card and a replacement Social Security card, respectively, using fraudulent immigration documents provided by Fall. The conspiracy lasted from April 1999 to November 2002.

The Government contends that Fall worked with numerous co-defendants, including Aimasiko, Ndiaye and Sumbodo, who acted as middlemen and referred aliens to Fall to purchase fraudulently obtained Social Security numbers. The Government notes that it called as witnesses approximately fourteen individuals who it refers to as "customers," because they purchased fraudulently obtained Social Security numbers from Fall via middlemen. These customers all testified about the similar procedure they followed to obtain their fraudulent Social Security cards. The customers testified they paid from $250 to $2,000 for their fraudulently obtained Social Security numbers.

The Government alleges that Fall sold the co-defendants and their customers fraudulent visas and Form I-94s. The illegal aliens needed fraudulent immigration documents with an immigration classification that allowed the Social Security Administration to issue them Social Security numbers. The aliens would then use the fraudulently procured Social Security cards to obtain work.

From 1999 to 2002, a Form I-94 was a document issued by the United States

Immigration and Naturalization Service ("INS") (now the Department of Homeland Security) which accompanied the alien's visa. The I-94 documented the non-immigrant classification of the alien, such as tourist, or visitor for pleasure or business or student. The alien's classification was also listed on his or her visa, and both the I-94 and visa were placed in the alien's passport and discussed with the alien by INS at the point of entry into this country. The alien's classification determined whether he or she could legally live and work in this country. The alien customers in this scheme were not lawfully entitled to Social Security numbers, because their classification did not lawfully allow them to remain and work in the United States.

The Government asserts that Sumbodo's actions assisted over seventy Indonesian aliens in securing Social Security numbers. Sumbodo was making money himself by charging his Indonesian customers more than Fall charged him. Sumbodo drove his customers to the Social Security office. Moreover, he received at least seventeen fraudulently obtained Social Security cards at his apartment address. The Government alleges that Sumbodo successfully recruited co-defendant Robert Soeryanto and Sasikin,[1] two Indonesians who purchased Social Security numbers from him, to refer him customers. Sumbodo asked Soeryanto to receive seven

---

[1]Sasikin testified that his family name is unknown, so he does not have a last name. In this country, he goes by Mr. Sasikin.

fraudulently obtained Social Security cards for Sumbodo's customers at Soeryanto's apartment. Sasikin referred approximately fifty customers.

The Government alleges that Aimasiko referred approximately twenty Nigerian individuals to Fall for assistance in securing fraudulently obtained Social Security numbers. Ten Social Security cards were mailed to Aimasiko's address. Fall paid $50.00 for each Social Security card that was mailed to his address. Aimasiko also assisted in the scheme by driving Fall and customers to the Social Security office. The Government contends that Fall charged Aimasiko $600 per customer, but Aimasiko charged the customers up to $1,000.

The Government contends that during the course of the conspiracy, Ndiaye was responsible for thirteen fraudulently obtained Social Security numbers for Senegalese customers. Six fraudulently obtained Social Security cards were mailed to Ndiaye's business address at 185 Mitchell Street, with others going directly to the customer. Fall testified that Ndiaye referred him customers, some of whom Fall would pick up at Ndiaye's hair braiding shop, and sometimes handed him the customer's money and passport.

The Government alleges that customers Kaire Ndao and Aida Leye testified that Fall picked them up at Ndiaye's shop and took them to apply for Social Security numbers. Ndiaye allowed them to stay at his home overnight when they traveled

7

from out of state to obtain their Social Security numbers. Ndiaye also picked up Leye at the airport.

The Government asserts that Diaw assisted her husband, Fall, in the conspiracy by receiving customers' fraudulently obtained Social Security cards at her hair braiding shops. Ten fraudulently obtained Social Security cards were mailed to Diaw's business addresses. Fall testified that Diaw would notify him when a card came to one of the hair braiding shops. Occasionally, Diaw brought the Social Security cards home to Fall. Additionally, eight fraudulently obtained Social Security cards were mailed to Diaw's address.

The Government alleges that Diaw told customer Penda Pene she needed a Social Security number to work in this country and told Pene to talk to Fall about purchasing a fraudulent Social Security number. Diaw collected money and passports from customers. Diaw posed as customer Haddy Sanyang at the Social Security office and applied for Sanyang's Social Security number using fraudulent documents. Diaw also gave Anin Alexis his passport and application for a Social Security number when Alexis came to her apartment.

Sumbodo, Aimasiko, Ndiaye, and Diaw challenge several rulings made by the district judge at trial. Their appeals also present various sentencing issues.

III. ISSUES

The Appellants raise the following issues on appeal:

(1) Each contends that the district court abused its discretion with respect to rulings regarding which witnesses could testify or in limiting the scope of the Defendants' cross-examination of the investigating agents;

(2) Aimasiko asserts that the district court erred in allowing the Government to cross-examine his character witness regarding a specific instance of conduct related to his character which he placed at issue;

(3) Each Appellant claims that the district court erred in giving a charge to the jury on deliberate ignorance, and Sumbodo contends that the court committed error in refusing to charge the jury on the theory of his defense;

(4) Ndiaye and Sumbodo assert there was insufficient evidence to support the jury's guilty verdicts;

(5) Sumbodo claims that the allegations in Count One, Section 1(B) of the Indictment are unintelligible and do not properly charge him with conspiracy to commit social security fraud;

(6) Ndiaye alleges that the district court erred in applying a two-level enhancement to his base offense level for obstruction of justice pursuant to U.S.S.G. § 3C1.1;

9

(7) Ndiaye contends that the district court committed error in applying enhancements to his base offense level for the number of documents involved in the offense;

(8) Sumbodo claims that the district court clearly erred in applying a four-level enhancement to his base offense level for his aggravating role as an organizer or leader of the conspiracy;

(9) Sumbodo asserts that the district court erred in refusing to apply a three-level downward adjustment on the basis that there was a profit motive;

(10) Sumbodo also contends that the district court erred in applying U.S.S.G. § 2L1.1 to determine his base offense level; and

(11) Ndiaye, Sumbodo and Aimasiko allege that the district court erred in enhancing their sentences based on findings not proved beyond a reasonable doubt.

## IV. STANDARD OF REVIEW

The district court's evidentiary rulings are reviewed for abuse of discretion. See United States v. Smith, 122 F.3d 1355, 1358-59 (11th Cir. 1997). The district court's discretion to control cross-examination of a character witness will only be disturbed when there is a showing of prejudicial abuse of discretion. See Michelson v. United States, 335 U.S. 469, 480, 69 S. Ct. 213, 220-21 (1948). A challenge to a jury instruction presents a question of law subject to de novo review. See United

States v. Tokars, 95 F.3d 1520, 1531 (11th Cir. 1996). A district court's refusal to give a jury instruction is reviewed for abuse of discretion. See United States v. Puche, 350 F.3d 1137, 1150 (11th Cir. 2003). Whether the evidence is sufficient to sustain a defendant's conviction is a question of law which we review de novo. See United States v. To, 144 F.3d 737, 743 (11th Cir. 1998). A district court's determination regarding sufficiency of the indictment is a question of law subject to de novo review. See United States v. Bobo, 344 F.3d 1076, 1083 (11th Cir. 2003).

A district court's determination of facts that support enhancements under the Sentencing Guidelines are findings of fact subject to the clearly erroneous standard. See United States v. Singh, 291 F.3d 756, 763 (11th Cir. 2002). The application of the Sentencing Guidelines to the facts as found by the district court is a question of law that we review de novo. See United States v. Yates, 990 F.2d 1179, 1182 (11th Cir. 1993). A district court's findings of fact for determining base offense level are subject to the clearly erroneous standard of review. See United States v. Kumner, 89 F.3d 1536, 1544 (11th Cir. 1996). Whether a particular guideline applies to a given set of facts is a question of law subject to de novo review. See United States v. Kirkland, 985 F.2d 535, 537 (11th Cir. 1993). When a defendant fails to object to a decision by the lower court, the issue is reviewed for plain error. See United States v. Mitchell, 146 F.3d 1338, 1342 (11th Cir. 1998).

11

## V. DISCUSSION

### A.  Testimony of Witnesses

#### (1) Huger's Testimony

All four Appellants contend that the district court erred in excluding the

testimony of co-conspirator Celestine Huger, the Social Security Administration

employee who was one of the leaders of the overall scheme.[2]  Ndiaye notes that the

theory of the Government at trial was that Huger was an integral part of and mover

of the alleged conspiracy.  The Government's key witness, Matar Fall, testified that

he met Huger at a flea market, where they initially discussed their scheme.  Fall

testified that Huger wanted him to pay her money for bringing individuals to her to

receive social security documents so that they might ultimately receive their Social

Security cards, and Fall also indicated that Huger had received money for each

transaction in the conspiracy.

Ndiaye alleges that rather than calling Huger as a witness, she was

"woodshedded" by the Government.  When counsel subpoenaed Huger, the

---

[2]The Government contends that neither Diaw nor Aimasiko objected to the district
court's decision to disallow Huger's testimony.  Moreover, only Ndiaye and Sumbodo sought to
call her as a witness.  The Government maintains, therefore, that Diaw and Aimasiko did not
preserve the issue for appellate review, so they must show that the district court committed plain
error.  Neither Diaw nor Aimasiko has responded to the Government's assertion that they did not
preserve for appellate review the issue of Huger's testimony.  It appears the issues were not
preserved by those Appellants.  Accordingly, our review as to them is for plain error.

12

Government filed a motion to exclude her testimony on the ground that it would be "collateral" to the proceeding. The district court ruled that the testimony would, in fact, be excluded. Huger was then called by Ndiaye so that he might proffer her testimony. Her testimony, as proffered, would have included the following: (1) Huger was told by Fall that she was trapped and would have to follow his instructions; (2) She initially helped Fall get his social security documents; (3) At first she did not believe what she was doing was illegal but later became aware that it was; (4) Money was not discussed but was merely paid to her; (5) Fall wanted her to "do" twenty cases a day, but she only wanted to do five; (6) She told agents of the Government, when they came to her, that she was being blackmailed by Fall; (7) Fall made comments on more than one occasion that could be interpreted as threats after Huger told him she was tired of being involved with him; (8) Huger had never heard of 185 Mitchell Street (the address for the salon that Ndiaye owned); and (9) Fall wanted to date Huger.

"When proffered evidence is of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility." United States v. Todd, 108 F.3d 1329, 1332 (11th Cir. 1997) (internal quotations omitted). In Todd, this Court determined that a district court abused its discretion in excluding testimony which went directly to the issue of intent. See id. at 1334.

13

Despite having heard the proffer, the district court excluded the testimony in this case as "collateral." Ndiaye contends that the testimony was relevant, and indeed critical to his defense. It would have served to impeach Fall, the crucial witness against the Appellants. It would have also demonstrated that Fall was a manipulative, if not threatening individual who would do what he needed in order to accomplish his goals. Most importantly, the testimony would have supported Ndiaye's defense that Fall was the only one orchestrating where and to whom the fraudulent documents were going. This would have been consistent with Ndiaye's theory that Fall or others instructed those who applied for documents to use the 185 Mitchell Street address without the Appellant's knowledge or consent.

Sumbodo[3] notes that a defendant has a Sixth Amendment right to "confront the witnesses against him." Pointer v. Texas, 380 U.S. 400, 404, 85 S. Ct. 1065, 1068 (1964). He contends that the effective confrontation of a witness necessarily includes a right to impeach the witness with conflicting evidence. Pursuant to Federal Rule of Evidence 403, relevant evidence is admissible unless its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Sumbodo contends that Huger's testimony would have impeached Fall's testimony about profits. Her testimony would have

---

[3]Sumbodo also adopted those portions of the briefs of Ndiaye and Diaw on this issue.

supported Sumbodo's claim that he did not keep any portion of the fees.

Diaw alleges that if allowed to testify, Celestine Huger could have impeached Matar Fall on matters that, though appearing to be minor, were "substantial building blocks in the prosecution of Ms. Diaw based upon their comparison to other minimal evidence of her conspiracy."[4] Diaw further notes that at the time of the trial in this case, Huger had already pled guilty to her participation in the crime and had been cooperating with the Government.

Diaw alleges that during the trial, a witness testified that Fall had told her that he was going to send his wife to the Social Security office to expedite that witness's documents. Diaw further notes Fall also testified that he had sent his wife to the Social Security office on one occasion. When he was confronted with the specific Social Security card application, however, Fall testified that he was familiar with his wife's handwriting and the application was not signed by his wife. Diaw contends that if allowed to testify, Huger could have also refuted the offered testimony by testifying that she could recognize Malene Diaw and that Diaw did not bring someone else's Social Security card application to her for processing. Huger's testimony would, therefore, have served to cast doubt on Fall's accusation that he had sent his wife to the office to help with the witness's documents.

---

[4]Aimasiko and Diaw have adopted the portions of the other Appellants' briefs which address the exclusion of Huger's testimony.

Based on the foregoing, Diaw contends that Huger's testimony would have been relevant and should not have been excluded pursuant to the Rule 403 balancing test. Diaw asserts that the exclusion of this testimony was prejudicial to her efforts to establish her lack of involvement in this crime.

The Government contends that the proffer of Huger's testimony demonstrated that it was irrelevant, as the impeachment of Fall was on a collateral matter. Federal Rule of Evidence 608(1)(b) provides in pertinent part: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness . . . may not be proved by extrinsic evidence." See also United States v. Marino, 277 F.3d 11, 24 (1st Cir. 2002) ("A matter is collateral if the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness.") (internal quotations omitted). The Government further alleges that even if the testimony should have been allowed, Ndiaye and Sumbodo have failed to show prejudice and Diaw and Aimasiko have failed to show plain error. "Even where an abuse of discretion is shown, non-constitutional evidentiary errors are not grounds for reversal absent a reasonable likelihood that the defendant's substantial rights were affected." United States v. Range, 94 F.3d 614, 620 (11th Cir. 1996). The Government further argues that allowing defense counsel to pursue impeachment on a wholly collateral matter or matters would have confused the issues and misled the

16

jury. Therefore, the exclusion of the testimony was within the district judge's discretion under Rule 403.

The Government notes that Huger testified in her proffer that she never met Ndiaye and did not know him. Moreover, she knew nothing about Fall's middlemen. Accordingly, the Government contends that Huger could provide no additional information about the scheme as it pertained to Ndiaye or any of the defendants on trial. The areas in which Fall's and Huger's testimony differed had no relevance to the participation in or knowledge of the conspiracy by the defendants on trial. Significantly, counsel for each of the defendants was able to thoroughly cross-examine Fall as to the facts of the conspiracy. Thus, there was no violation of a right to confrontation.

As for Sumbodo's argument regarding the issue of whether Sumbodo participated in the conspiracy to make a profit, the Government contends that there was no testimony proffered by Sumbodo to indicate that Huger had any knowledge concerning the prices Fall charged to customers of various nationalities. Counsel for Sumbodo cross-examined Fall concerning what he charged Indonesian customers. Consequently, the Government contends that even if this Court finds that the district court should have allowed Huger to testify, the Appellants were not prejudiced by that court's evidentiary ruling.

Ndiaye notes that the Government acknowledges that Huger "processed the

17

SSNs based on fraudulent immigration documents . . . provided by Fall." He contends, therefore, that Huger was an integral part of the conspiracy. Ndiaye alleges that not only was the testimony of Huger relevant and not collateral, it was crucial to his defense. Huger would have testified that Fall alone solicited or even pressured her to participate in the fraudulent scheme. Moreover, Huger would have testified as to threats made by Fall, such as when he allegedly said that she "would wish that [she] never walked the streets" if she did not continue to participate in the scheme. Huger also would have testified that she had never been to Ndiaye's address at 185 Mitchell or even heard of this address prior to counsel's question.

Ndiaye contends that Huger's testimony would have done much more than simply demonstrate that Matar Fall is a manipulative individual. Ndiaye reiterates that, most importantly, the testimony would have bolstered his defense that Fall was the only one orchestrating where and to whom the fraudulent documents were going, given that his defense to the charge of the conspiracy was that Fall, or others, instructed those who applied for documents to use the 185 Mitchell Street address without Ndiaye's knowledge or consent.

Ndiaye also alleges that the Government's reliance on <u>Marino</u>, 277 F.3d at 24, is misplaced. He contends that case is inapposite for a couple of reasons. First, the witness in <u>Marino</u> was not involved in the case, as Huger was in this case, but was merely a witness to the charge of attempted murder against Marino. <u>See</u> <u>id.</u> at 23-24.

18

Moreover, Ndiaye asserts that the charges against that defendant, conspiracy to commit murder and various RICO violations, were actually collateral to the witness's involvement in any prior drug dealing; thus, such testimony was properly excluded. See id. We agree that because of the different factual scenarios between the cases, the First Circuit's analysis in Marino is not applicable to this case.

Based on the foregoing, therefore, Ndiaye alleges that the proffered testimony of Huger was neither collateral nor irrelevant. Accordingly, the probative value of that testimony substantially outweighs the dangers of unfair prejudice, confusion of the issues, possibility of misleading the jury, consideration of undue delay, waste of time, or needless presentation of evidence under Rule 403. Ndiaye notes that this Court has observed that excluding evidence under Rule 403 is "an extraordinary remedy that should be used only sparingly since it permits the trial court to exclude concededly probative evidence." United States v. Chandler, 996 F.2d 1073, 1101 (11th Cir. 1990).

Sumbodo alleges testimony that impeaches the relevant testimony of the star Government witness and lead defendant is not a "collateral matter." He contends that Huger's testimony would have impeached Fall about his conspiratorial relationships, his conduct during the conspiracy, and his profits from the conspiracy. Sumbodo notes, moreover, that Fall and Huger were the organizers of the entire conspiracy. Fall may have lied about his relationship with Huger and his own conduct in the

19

conspiracy. However, the defendants were still barred from calling Huger to impeach Fall.

Sumbodo claims that one of the critical issues in his case is whether he profited by assisting other Indonesian applicants. The jury would reasonably construe a profit motive as evidence of knowledge, criminal intent, or even deliberate indifference. Sumbodo's sentence was also enhanced because of this profit motive. Sumbodo contends that the only evidence that he acted for profit was the testimony of Fall, who claimed that he charged the Indonesian applicants less than the fee charged by Sumbodo. The Government asserted at trial that Sumbodo profited by keeping the additional fee. Sumbodo claims that Huger would have impeached Fall's testimony about the profits he obtained from applicant fees. Moreover, Huger's testimony would have verified that Fall was lying about his own profits. Fall attributed substantial profits to Huger that were actually kept by him. Sumbodo contends that this testimony would have necessarily supported Sumbodo's contention that he was unaware of the conspiracy and that Fall kept all of the profits from Indonesian applicants.

There is little question as to why the Government sought to exclude the testimony of Celestine Huger. Matar Fall was a crucial Government witness and her testimony would have no doubt portrayed him as a "manipulative, if not threatening" individual. The district court determined that it would "disallow the testimony

20

because [Huger] would only testify as to collateral matters." Much of the testimony, as proffered by Ndiaye, does appear to relate to collateral matters. It is difficult to see how some of the testimony–specifically Fall's alleged threats and blackmail, his desire to pursue a personal relationship, Huger's initial belief that what she was doing was not illegal, and the number of cases she wanted to "do" per day, as opposed to how many Fall wanted her to do–would have been relevant to any issue raised by these Appellants, except that it would have portrayed the Government's star witness in a negative light. Ndiaye and the other Appellants had the opportunity to accomplish this in cross-examining Fall. At the hearing when Huger's testimony was proffered, the only questions asked by counsel for the Government were whether Huger knew or recognized Amadou Fall Ndiaye. Huger responded that she did not know the name and had never seen Ndiaye.

The most relevant portion of Huger's proffered testimony would appear to be her statement that she had not heard of 185 Mitchell Street, the address for the salon that Ndiaye owned with his wife and where certain documents were sent. Huger would have testified that she was unfamiliar with any of the addresses on the documents submitted. Ndiaye contends this would have bolstered his defense that Fall was the only one determining where and to whom the fraudulent documents were going. Moreover, Ndiaye contends this would have been consistent with his defense to the charge of conspiracy that Fall or others instructed those who applied for Social

21

Security numbers to use the 185 Mitchell Street address without Ndiaye's knowledge or consent.

We believe that the better course would have been to allow Huger's testimony. Even though Huger would have testified that she was unfamiliar with the 185 Mitchell Street address, however, we are unable to see how this would have helped Ndiaye's defense to the conspiracy charge. Huger's proffered testimony would not have refuted Fall's testimony that six fraudulently obtained Social Security cards were mailed to Ndiaye's business at 185 Mitchell Street or that he picked up customers referred by Ndiaye from that same address. Other evidence linking Ndiaye to the conspiracy came from two customers, Ndao and Leye, who testified that Fall picked them up at Ndiaye's hair braiding shop and took them to apply for Social Security numbers. While the evidence against Ndiaye on the conspiracy charge may not have been overwhelming, the fact that Huger did not know about the connection to his business address would have been of little assistance. In short, we conclude that the district court's exclusion of Huger's testimony as to Ndiaye was not an abuse of discretion.

Sumbodo also preserved his objection to the district court's ruling that Celestine Huger's testimony was collateral. There is a dispute between Huger and Fall regarding how much Huger was paid. According to Huger, Fall decided how much he would pay her. Huger stated that Fall paid her an average of $800 to $1,000

22

per week and never paid her more than $1,500 for one week. Fall testified that Huger had demanded and received payments of $2,500 per week.

Sumbodo contends that Huger's testimony would have impeached Fall about his conspiratorial relationships, his conduct during the conspiracy, and his profits during the conspiracy. Sumbodo further claims that the only evidence he acted for profit was the testimony of Fall, who stated that he charged the Indonesian applicants less than the fee charged by Sumbodo. The Government alleged that Sumbodo profited by keeping the additional fees. Sumbodo asserts that because Huger stated that Fall attributed substantial profits to her that were actually kept by Fall, Huger's testimony would have demonstrated that Fall was lying about his own profits. Sumbodo claims this would have necessarily supported his defense that he was unaware of the conspiracy and that Fall kept all of the profits from the Indonesian applicants.

There is nothing in Huger's proffered testimony presented by Ndiaye which indicates that she had knowledge of any arrangement regarding how Fall and Sumbodo would divide profits, and Sumbodo did not proffer any testimony regarding Huger's knowledge of the conspiracy. Accordingly, there is nothing in the record which indicates that Huger had any knowledge regarding the prices that customers of various nationalities were charged. Moreover, Huger did not even know Sumbodo. Therefore, we are unable to see how her testimony would have assisted Sumbodo's

defense to the conspiracy charge except that, as we previously noted, it would have perhaps portrayed Fall as a person of questionable character. Additionally, Sumbodo's counsel had the opportunity to cross-examine Fall regarding the amount that he charged the Indonesian customers.

It is also worth noting that there was testimony in addition to that of Fall which supported Sumbodo's conspiracy conviction. Sasikin testified that Sumbodo had told him that Fall was his "Boss," and that Fall made fake visas that were to be submitted with customers' Social Security applications. Sasikin also stated that Sumbodo informed him who to talk to and how to proceed when he went to the Social Security office.

We are unable to see how Huger's testimony would have impeached Fall about his conspiratorial relationships, his conduct during the conspiracy, and his profits during the conspiracy. Because Huger apparently had little or no knowledge about these topics, her testimony would have likely demonstrated only that Fall was a person of questionable character. Accordingly, the district court's exclusion of Huger's testimony as to Sumbodo was not an abuse of discretion.

Diaw and Aimasiko also allege that the district court erred in excluding Huger's testimony. We do not correct an error that a defendant failed to raise in the district court, unless it is an error that is plain and affects substantial rights. See United States v. Ramirez, 426 F.3d 1344, 1358 (11th Cir. 2005). If those conditions

are satisfied, we may correct only those errors which affect the "fairness, integrity, or public reputation of judicial proceedings." Id. (internal quotations omitted). Diaw and Aimasiko are unable to establish that the exclusion of Huger's testimony constituted plain error.

We conclude that the exclusion of Huger's testimony was not an abuse of discretion.

### (2) Limitation of Cross-examination

Diaw contends that she attempted to establish in her cross-examination of Special Agent Christopher Wright that her husband, co-defendant Matar Fall, in his interview with Fall on the date of his arrest, did not implicate and in fact exonerated his wife in his dealings with Huger. Diaw asserts that Agent Wright's interview of Fall contained Fall's complete vindication of his wife "for using the addresses and that she had nothing to do with it." Diaw notes that neither the Government nor the district judge disputed the relevancy of the evidence. The Government objected that the matter was collateral–that Diaw's counsel could not question the agent on a matter that could be used to impeach Fall. Diaw contends that if this relevant information had been made known to the jury, she would likely not have been convicted on Count One, given that the evidence supporting a conviction was inferential. Agent Wright could have rendered credible the testimony of chief conspirator Fall. The district court ruled that the evidence to be elicited was "impeaching Mr. Fall, so it is

collateral. So I have to sustain the objection."

The denial of a defendant's Confrontation Clause right to cross-examination is examined for harmless error. See Olden v. Kentucky, 488 U.S. 227, 232, 109 S. Ct. 480, 483 (1988). "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." Id., 109 S. Ct. at 483.

Diaw contends that she should have been permitted to examine Agent Wright to render credible the testimony of chief conspirator Fall about his wife. She claims that the agent's testimony would have bolstered that of Fall, who testified that his wife had nothing to do with using the three addresses at issue in the case. Moreover, Agent Wright may have reiterated Fall's testimony that Diaw constantly argued with her husband regarding the questionable activity engaged in by Fall. Diaw asserts that she was deprived of the ability to establish by the agent's admission that Fall stated to Agent Wright in his post-arrest interview that he used those addresses, they were not set up by his wife, and were his own design.

The Government notes that there was no proffer as to what Agent Wright's testimony would have been. However, defense counsel stated he was trying to reiterate Fall's testimony that Fall was responsible for using the addresses where the Social Security cards were mailed. The Government contends this would have merely

26

been cumulative of other evidence.  A district court may limit the scope of cross-examination when appropriate.  United States v. Gonzalez, 71 F.3d 819, 835-36 (11th Cir. 1996).  In this case, the district court did not allow Diaw to ask whether Fall told Agent Wright that he was the one responsible for the Social Security cards mailed to Diaw's business addresses, determining this matter to be collateral.

As the Government alleges, Fall had already testified that he chose the addresses where the cards were mailed and that Diaw did not want him to sell Social Security numbers or use her business addresses. If Fall's testimony had been inconsistent on this issue, then it would be easy to understand why Diaw would want to present Agent Wright's testimony.  However, there was no difference between Fall's trial testimony and his statement to the agent upon his arrest.  In both cases, Fall minimized his wife's role in the conspiracy.  Accordingly, the testimony that Diaw sought to elicit from Agent Wright would have been cumulative and collateral. Any error was harmless, and it was within the district court's discretion to exclude the testimony under Federal Rule of Evidence 403.

Ndiaye also contends that counsel sought to elicit from witnesses the facts that had earlier been related by Fall to agents in his numerous debriefings.[5]  Counsel sought to elicit from Special Agent Leonard Cabe, who had testified in the

---

[5]Aimasiko and Diaw have adopted the arguments on this issue contained in Ndiaye's brief.

Government's case, information that had earlier been related to him by Fall pertaining to Ndiaye's wife passing documents to Fall (as opposed to Ndiaye). Ndiaye also sought to elicit testimony from the agent regarding Fall's alleged statements to agents about Ndiaye's warnings to Fall about not engaging in any wrongdoing. All purported questions for Special Agent Cabe relating to Fall's statements regarding his relationship with Ndiaye's wife, her possible involvement in the offense, and inconsistent statements given by Fall were excluded. Ndiaye alleges the district court's exclusion of relevant evidence, on the ground that it was collateral, served only to insulate the witness against the damning effect of his prior statements, as well as to deny Ndiaye his constitutional rights to a fair jury trial and to confront his accusers. The Government notes that Ndiaye's counsel cross-examined Fall extensively about Ndiaye's role in the scheme. Moreover, Ndiaye's counsel questioned Fall about his prior statements to agents, allowing counsel to establish that Fall's statements had changed from the earlier debriefings. The Government contends that because there was substantial evidence other than Fall's testimony which supported Ndiaye's convictions, any error in excluding certain questions during the cross-examination of Agent Cabe regarding the impeachment of Fall was harmless.

Ndiaye further alleges that the evidence he sought to introduce was neither irrelevant nor collateral because it is entirely consistent with his defense to the charge

28

of conspiracy that Fall, or others, instructed those who applied for documents to use the 185 Mitchell Street address without Ndiaye's knowledge or consent. He asserts, therefore, that this Court should find that the error was not harmless beyond a reasonable doubt.

While we believe that Ndiaye's counsel should have been permitted to cross-examine Agent Cabe about these matters, we conclude that any error in excluding this testimony was harmless. As the Government alleges, counsel was able and did cross-examine Fall about previous inconsistent statements that he made to the agents. Therefore, even though he was not permitted to question Agent Cabe about these topics, Ndiaye was able to present evidence regarding Fall's prior statements minimizing Ndiaye's role in the conspiracy.

We conclude that any error in excluding the testimony was harmless and was within the district court's discretion.

### (3) Diaw's selective prosecution claim

Diaw claims that she was selected for prosecution as one of over 2,000 persons who were connected to and engaged in the conspiracy. Diaw sought to establish this by eliciting basic information from Special Agent Wright. The district court determined, however, that further examination of the agent regarding her connection to the conspiracy was a collateral matter not admissible under Rule 403.

Diaw alleges that she was singled out for no reason other than she is the wife

of Matar Fall, who arranged with Huger to have thousands of social security cards issued to recipients who were not entitled to the cards, and arranged to have the cards mailed to addresses where his wife or his daughters worked and to his home. Diaw contends Special Agent Wright testified that he told Malene Diaw that "the reason he had a warrant for her arrest was because of the quantity, the amount of cards that went to two businesses that were in her name and to her house." However, there were approximately 2,000 people who were not prosecuted; these are people who benefitted by paying sizable sums for cards that they knew they were not entitled to. Diaw alleges that every individual indicted, except for her, monetarily profited from the conspiracy and/or brought illegal aliens to Fall and Huger for issuance of Social Security cards. Diaw asserts that counsel sought to examine the agent at trial in order to obtain further information not available by discovery, but the district court deemed the testimony inadmissible on the ground that it was a collateral matter.

Diaw alleges that based on the foregoing, one can only conclude that she was prosecuted because of her marriage to Matar Fall or her foreign nationality. She contends that either of these reasons is a suspect basis for selective prosecution.

The Government alleges that Diaw failed to raise her selective prosecution claim before trial, as is required by Federal Rule of Criminal Procedure 12(b)(3)(A). Even if her selective prosecution claim had been properly raised, however, Diaw would be entitled to no relief.

30

As the Government alleges, to establish selective prosecution, a defendant must show that the prosecution was predicated on a constitutionally impermissible motive, such as on the basis of race or religion, or in retaliation for her exercise of constitutional rights. See United States v. Smith, 231 F.3d 800, 807-08 (11th Cir. 2000). Because Diaw argues that she was selectively prosecuted on the basis of being married to Fall, the district court did not abuse its discretion in limiting the cross-examination of Agent Wright on this issue. She also makes brief reference to being prosecuted on the basis of her foreign nationality. That argument obviously lacks merit, given that this entire case is about aliens attempting to obtain documents in order to reside in the United States.

We conclude that the district court did not abuse its discretion in limiting the cross-examination of the agent.

B. Aimasiko's character witnesses

Aimasiko contends that the trial court abused its discretion in allowing the Government to question his three character witnesses regarding a letter that he sent to a female neighbor requesting a "get-together." The letter read:

> I know you are always at home in the morning like myself and I know you do not like loneliness. Would you mind if I keep you company in the morning as my wife will be at work and I know your husband would be working too. Call this number to talk to me today before 2:00 p.m. Or early tomorrow morning.

The note included a telephone number, which the case agents determined was

31

Aimasiko's home number. The jury did not see the letter. The questions posed by the Government to the character witnesses were whether it would surprise the witness to learn that during the period of time that he or she considered Aimasiko to be an honest and truthful person, he attempted to have a relationship with a woman who was not his wife, and whether that would change the witness's opinion as to Aimasiko's reputation for honesty and truthfulness.

Aimasiko contends that the Government did not have a good faith factual foundation for questioning his character witnesses regarding the letter to his neighbor. Moreover, such a question is akin to asking about a past arrest or prior misconduct and therefore is prejudicial and should be excluded under Rule 403. Aimasiko asserts that the trial court erred in failing to ascertain, out of the jury's presence, a good faith factual foundation for the inquiry and in failing to instruct the jury as to the limited weight given to the cross-examination. He contends that the fact that the Government did not bring the issue to the court outside of the presence of the jury demonstrates bad faith. Moreover, because the character witnesses were being directly questioned regarding Aimasiko's truthfulness, honesty, and whether they would believe him under oath, the cross-examination should have consisted of instances in which Aimasiko had not been truthful and honest–not questions based no rumors. Aimasiko alleges that even if the questions were determined to be relevant, the prejudicial effect of the introduction of this evidence is extreme.

The Government contends that Aimasiko's attempt to engage in a surreptitious relationship with a woman who was not his wife was relevant to his honesty and truthfulness, which he had put into issue by calling character witnesses, and the prejudicial effect of the evidence did not outweigh its relevance.

The Government notes that after its initial question to the first character witness, the district court took up the matter for consideration outside the jury's presence. Thus, because the court allowed the cross-examination to continue, Aimasiko was not prejudiced by the Government's first question in the presence of the jury. Finally, the Government contends that even assuming the court erred in allowing the cross-examination of Aimasiko's character witnesses as to the note, the error was harmless in light of the overwhelming evidence of his knowing participation in the illegal conspiracy.

Aimasiko acknowledges that once a witness has testified about a defendant's good character, cross-examination inquiry is allowed as to whether the reputation witness has heard of particular instances of conduct relevant to the trait in question. United States v. Adair, 951 F.2d 316, 319 (11th Cir. 1992). A trial court's discretion to control cross-examinations of character witnesses is disturbed only upon a showing of prejudicial abuse of discretion. See id. at 319-20. The Government must have a good faith basis for the instances of conduct inquired about, and the instances must be relevant to the character traits at issue in the case. See id. at 319.

33

The district court should not have permitted the Government to question the character witnesses regarding the letter that Aimasiko apparently sent to his neighbor. As Aimasiko alleges, some of the factual circumstances surrounding the letter are unknown. Moreover, while the letter does perhaps suggest that Aimasiko was not being entirely candid with his wife, it does not directly relate to the Appellant's truthfulness and honesty. Accordingly, there was a significant danger of unfair prejudice to the Appellant in allowing these questions.

We conclude, however, that the district court's error was harmless in light of the overwhelming evidence against Aimasiko. This included the testimony of Fall and individuals who Aimasiko assisted in obtaining Social Security cards. It also included Aimasiko's own testimony and various Social Security and Immigration certified records. The evidence regarding Aimasiko's knowing participation in the conspiracy was overwhelming.

It is also worth noting that two of the three character witnesses testified their opinion of Aimasiko's reputation for character and truthfulness would not have changed. At oral argument, moreover, counsel for the Government stated that the Government did not reference the character evidence in its closing argument.

We conclude that the error in this case was harmless. The district court did not abuse its discretion in allowing the questions.

C. Jury Instructions

(1) Deliberate Indifference

The Government requested a jury instruction on the issue of "deliberate indifference." Aimasiko objected at trial to this instruction. The Government alleges that Aimasiko does not raise the issue on appeal. However, Aimasiko adopted the arguments in the briefs of Ndiaye and Sumbodo[6] on this issue, so he has preserved it for appeal. Ndiaye, Sumbodo and Diaw include arguments in their briefs on this issue. The Government alleges that Diaw did not preserve the issue at trial, so she should not be allowed to raise it for the first time on appeal. See United States v. Flynt, 15 F.3d 1002, 1006 (11th Cir. 1994). Diaw contends that counsel for Aimasiko was "the spokesperson on behalf of all Defendants pursuant to the understanding that, unless expressly opted out, one counsel's objections are applicable to all Defendants." The Government asserts that Diaw's counsel at trial did not adopt the objections of the other lawyers to the charge or object to the instruction himself.

The record is unclear as to Diaw's assertion. However, it does show that following the argument of Aimasiko's counsel, the district court overruled the objection and determined it would "allow that charge in over the objection of the defense." Because the court did not reference any particular defendant, we will give

---

[6]Sumbodo has adopted the arguments on this issue contained in the briefs of Ndiaye and Diaw.

Diaw the benefit of the doubt on whether she preserved the issue of the deliberate indifference instruction.[7]

The district court granted the Government's request and included a jury instruction on deliberate indifference. The charge was titled "Deliberate Ignorance (as Proof of Knowledge)," and read as follows:

> Ladies and Gentlemen of the jury, when knowledge of the existence of a particular fact is an essential part of an offense, such knowledge may be established if the defendant is aware of a high probability of its existence, unless the defendant actually believes that it does not exist.

> So with respect to the issue of the defendant's knowledge in this case, if you find from all the evidence beyond a reasonable doubt that the defendant believed that he or she committed the offenses charged and deliberately and consciously tried to avoid learning that the social security cards were obtained through fraudulent means in order to be able to say if apprehended that he or she did not know of the fraudulent means, you may treat such deliberate avoidance of positive knowledge as the equivalent of knowledge.

> In other words, you may find that a defendant acted knowingly if you find beyond a reasonable doubt that either: one, that the defendant actually knew that he or she was committing the offenses charged; or two, that he or she deliberately closed his or her eyes to what he or she had every reason to believe was the fact.

> I must emphasize, however, that the requisite proof of knowledge on the part of the defendant cannot be established by merely demonstrating that the defendant was negligent, careless, or foolish.

This charge was submitted by the Government and charged by the court.

---

[7]Diaw has adopted the arguments on this issues contained in the briefs of Ndiaye and Sumbodo.

The Appellants contend that the charge was prejudicial and unsupported by any evidence in the case. They allege the Government provided no legitimate justification for a charge on deliberate indifference. Each Appellant either acted with or without knowledge of the conspiracy and the fraudulent scheme. Sumbodo contends that his defense was based on evidence that he, like the other applicants, was unaware of the forged documents or that the Social Security numbers were unlawfully issued. There was no evidence or contention that Sumbodo was deliberately indifferent of relevant facts.

Ndiaye also contends that he neither testified nor offered evidence which would in any way suggest that he was acting with deliberate ignorance. He asserts the charge suggests that there was some evidence which was somehow elicited which could authorize a jury to consider the concept of deliberate ignorance, yet that concept was not placed before the jury by the Government.

Diaw alleges the charge was not specific to the facts of the case. Diaw notes that she did not testify, and the instruction was not pertinent to any testimony offered by her or the Government. Moreover, Diaw contends that because she was the only female defendant and because the instruction refers to "he or she" multiple times, it can only be assumed that the jury followed the instruction and considered whether she "deliberately and consciously tried to avoid learning that the Social Security cards were obtained through fraudulent means," even though Diaw alleges no evidence

37

was presented that "she closed her eyes."

The Government notes first that the district court used the applicable Eleventh Circuit pattern instruction for deliberate indifference. Moreover, it alleges that counsel for Sumbodo raised the issue of deliberate indifference numerous times during his cross-examination of Government witnesses, suggesting that Sumbodo and his customers were unaware they were obtaining social security cards fraudulently. Additionally, Fall testified that Celestine Huger was the only Social Security employee who could process the applications, and she "wouldn't ask people questions."

The Government also alleges that Ndiaye's counsel raised the deliberate indifference issue when he insinuated that Ndiaye did not know the documents were fraudulent because he never saw the fraudulent I-94s and visas in Fall's house. Ndiaye's counsel elicited from Agent Cabe that Ndiaye stated he knew nothing about the Social Security cards being sent to his salon's address. The Government contends there was evidence of actual knowledge and deliberate indifference as to Ndiaye, and either was an adequate basis for conviction.

The Government further alleges that Diaw put her knowledge of the fraudulent documents at issue, and a deliberate indifference instruction was therefore appropriate. Specifically, Diaw's knowledge of her husband's illegal activities was raised in her attorney's questions of Fall. Because Fall testified that his wife had

38

nothing to do with the fraudulent business, moreover, the Government claims that Diaw placed her knowledge of the fraudulent documents at issue, and consequently, a deliberate indifference instruction was proper.

Sumbodo alleges that he either knew what was "going on" or he did not know. He either knew that Celestine Huger was participating in an illegal scheme or he did not know. Sumbodo contends that no evidence was presented which would indicate that he was deliberately indifferent about any aspect of the scheme. Consequently, Sumbodo claims that the instruction on deliberate indifference was reversible error.

Having reviewed the record, we conclude that there was sufficient evidence for the district court to give the instruction as to each Appellant. Even if this were not the case, however, the Appellants would be unable to show harm from the error.

This Court has cautioned district courts "against instructing juries on deliberate ignorance when the evidence only points to either actual knowledge or no knowledge on the part of the defendant." United States v. Stone, 9 F.3d 934, 937 (11th Cir. 1993). Such an instruction is appropriate "only when there is evidence in the record showing the defendant purposely contrived to avoid learning the truth." Id. (internal quotations omitted). In Stone, the Court went on to conclude that any error was harmless in that the jury's application of the deliberate indifference instruction was conditioned on proof beyond a reasonable doubt. See id. at 937-38. "The only way we can conclude that the deliberate ignorance instruction was harmful is if we assume

that the jury applied the instruction contrary to its express terms." Id. at 938.

The same situation exists here. There is no allegation that the jury instruction, an Eleventh Circuit pattern instruction, was an incorrect statement of the law. The jury's application of the deliberate indifference instruction was conditioned on proof beyond a reasonable doubt. We have no reason to believe that the jury applied the instruction contrary to express its terms. Assuming that the deliberate indifference instruction should not have been given, therefore, the district court's error was harmless.

### (2) Sumbodo's Theory of the Defense

Sumbodo alleges the district court erred in refusing to give a jury instruction on the theory of his defense. Sumbodo contends that he submitted two proposed instructions stating the theory of his case, the substance of which was that he should be acquitted unless he knowingly and willfully committed the offenses. The district court did not give any instruction on the defense theory, even though Sumbodo's attorney argued that Sumbodo was unaware of the fraudulent scheme. Sumbodo asserts that although the court used and defined the words "knowingly" and "willfully" to describe the offenses charged, the court never informed the jury that a defendant's lack of knowledge or intent constituted a legal defense.

"The district court should instruct the jury on the defendant's defense theory if the theory has a foundation in evidence and legal support." United States v. Schlei,

122 F.3d 944, 969 (11th Cir. 1997) (citation omitted). However, a more specific instruction on a "theory of the defense" is not warranted when the charge given adequately covers the substance of the requested instruction. See United States v. Jones, 933 F.2d 1541, 1544 (11th Cir. 1991). A district court's refusal to give such an instruction is reversible error only when (1) the proposed instruction is correct, (2) the instruction was not addressed in the charge actually given, and (3) the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense. See id.

The Government contends that the jury was adequately instructed, using the charging language from the Eleventh Circuit pattern instructions, that the defendants could not be convicted unless the Government proved beyond a reasonable doubt that they "knowingly and willfully" conspired to "knowingly produce, transfer and possess" identification documents of the United States, "knowing that such documents were produced without lawful authority." The judge charged the jury that Sumbodo was charged with "knowingly and willfully" making false statements to the Social Security Administration in connection with his own application for a Social Security number. Finally, the court charged the jury that Sumbodo was charged with encouraging and inducing an alien to reside in the United States, "knowing and in reckless disregard" that the alien's residence in the United States was unlawful. As for the conspiracy charge, the same type of language was used. The Government

41

contends, therefore, that the "theory of the defense" charge tendered by Sumbodo was properly refused by the court.

Sumbodo's proposed instruction on his theory of defense was addressed in the instructions which were given. We conclude, therefore, that the district court did not abuse its discretion in refusing to give Sumbodo's requested instruction.

### D. Sufficiency of the Evidence

#### (1) Conspiracy

Both Ndiaye and Sumbodo argue that the evidence was insufficient to support their convictions on the conspiracy count. Ndiaye contends that the evidence was insufficient to support his conviction on Count One for conspiracy to commit identification document fraud and Social Security fraud. Ndiaye moved both prior to the defense case and at the close of evidence for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. In both instances, his motion was denied. Sumbodo's motions under Rule 29 were also denied. Sumbodo contends that the evidence did not support a conviction on Count One, which alleged that he conspired with the co-defendants to "encourage and induce aliens to enter and reside in the United States," in violation of 8 U.S.C. § 1324(a)(1)(A)(iv).

In order to obtain a conviction for conspiracy under 18 U.S.C. § 371, the Government must prove (1) that an agreement existed between two or more persons to commit a crime; (2) that the defendant knowingly and voluntarily joined or

42

participated in the conspiracy; and (3) a conspirator performed an overt act in furtherance of the agreement. See United States v. Ellington, 348 F.3d 984, 989 (11th Cir. 2003). The knowledge requirement is satisfied when the Government shows a defendant's awareness of the essential nature of the conspiracy. See United States v. Lluesma, 45 F.3d 408, 410 (11th Cir. 1995). A conviction for conspiracy may be obtained via circumstantial evidence. See United States v. Chandler, 388 F.3d 796, 806 (11th Cir. 2004). While viewing the evidence in the light most favorable to the Government, we must determine whether a reasonable finder of fact could conclude that the Appellants were guilty beyond a reasonable doubt. See United States v. Williamson, 339 F.3d 1295, 1299 (11th Cir. 2003). Because the jury is free to choose among reasonable constructions of the evidence, the evidence may be sufficient even if it is not entirely inconsistent with conclusions other than guilt. See United States v. Rudisill, 187 F.3d 1260, 1267 (11th Cir. 1999).

Ndiaye contends the Government never proved that he joined the conspiracy. He alleges that the Government's evidence was contradictory and unreliable. Other than Matar Fall, no witness related that he had given any money to Ndiaye. Moreover, there was no evidence that Ndiaye participated in any phone calls with the alleged recipients of the documents at the time the documents were being transferred. He had never filled out any forms or delivered any relevant documentation. The only evidence connecting Ndiaye to the conspiracy was provided by Fall, and Ndiaye

alleges that he would have been impeached if not for the court's erroneous evidentiary rulings. Consequently, Ndiaye contends there was insufficient evidence to convict him of conspiracy.

As for his conspiracy conviction, Sumbodo contends that the Government failed to prove beyond a reasonable doubt that he acted with knowledge and criminal intent in performing the acts used to support his convictions. Sumbodo asserts that the only witness to present evidence that he acted with knowledge and/or criminal intent was Sasikin. Sumbodo alleges that Sasikin was thoroughly impeached by the self-serving nature of his testimony, his conviction for a lesser offense, his contradictions with other witnesses (including Fall), his hostility toward Sumbodo, and his failure to remember important details. Specifically, Sasikin could not remember any details about the false visa Sumbodo allegedly showed him that was to be submitted with an application for a Social Security card. Sasikin could not recall, for example, the name of the applicant, the source of the false visa, or any other details about the false visa.

Sumbodo claims that if Fall and other Government witnesses such as Alexis Anin were telling the truth, then Sasikin's testimony had to be false. Fall and Anin testified that Fall put false visas in sealed envelopes with the Social Security applications on the same day that the applications were submitted. The applicants were told to keep the documents sealed until they were submitted to Celestine Huger

44

at the Social Security office. The documents were then returned immediately to Fall, who removed the false visas, to ensure that the applicants and others such as Sumbodo would not know about the false documents. Sumbodo alleges that other Government witnesses, including individuals such as Robert Soeryanto who referred applicants in the same manner as Sasikin, were unaware of any false documents. Sumbodo contends, therefore, that his conspiracy conviction must be reversed because it cannot be based on contradictory and uncorroborated testimony which was impeached by other Government witnesses.

Regarding the Appellants' conspiracy convictions, the Government alleges that their arguments are mainly with the jury's decision to believe particular witnesses. Ndiaye argues that Matar Fall should not be believed; Sumbodo contends that Sasikin should not be believed. The Government contends this is a credibility determination that the jury is entitled to make. Moreover, the jury was presented with documentary evidence pertaining to knowledge and criminal intent.

In his reply brief, Sumbodo alleges that the Government relies exclusively on the "thoroughly impeached testimony of Sasikin that Sumbodo eventually learned about the forged documents." He asserts that Sasikin's testimony was vague, incredible and largely contradicted by other Government witnesses. Sumbodo further claims that Sasikin could not give any details as to when Sumbodo became aware about the forged documents. Sumbodo asserts that even if Sasikin's testimony was

credible, it was so vague that no jury could determine that Sumbodo acquired guilty knowledge during the conspiracy. Because he never kept any false documents during the conspiracy, moreover, it is more likely that Sumbodo discovered the false documents abandoned by Matar Fall after the conspiracy ended.[8] Sumbodo contends, therefore, that because there was no evidence he knew of the conspiracy or that he acted with criminal intent during the conspiracy, it can only be presumed that Sumbodo discovered the false documents evidencing Fall's scheme after the conspiracy ended.

From our review of the record, we conclude that the evidence is sufficient to show that Ndiaye had knowledge of and participated in a conspiracy to commit identification fraud and Social Security fraud. Fall testified that Ndiaye referred up to thirteen customers to him. He testified that the number of customers referred by Ndiaye was at least ten. The testimony is somewhat confusing on this point but it appears that based on these referrals, Fall stated that six of the Social Security cards were mailed to Ndiaye's business address at 185 Mitchell Street, and at least four cards were sent to other addresses in Atlanta. Fall also testified that he sometimes picked up customers that Ndiaye referred from the hair braiding shop at 185 Mitchell. Ndiaye would also sometimes hand Fall the customer's money and passport while at

---

[8]Sumbodo notes that the jury was not aware that these documents were suppressed because of an illegal search of his apartment at the time of his arrest. Fall was no longer able to obtain Social Security numbers for applicants, so he had left the documents with Sumbodo.

the shop.

One customer, Kaire Ndao, also testified that she stayed with Ndiaye and his wife, Assane, on two occasions and was also twice picked up by Fall from Ndiaye's place of business and taken to the Social Security office. Another customer, Aida Leye, testified that the Ndiayes picked her up from the airport and that she stayed with them. Leye testified that Assane Ndiaye introduced her to Fall at the hair braiding shop at 185 Mitchell Street. Amadou Ndiaye was also present at that time. Leye testified that Fall then took her to the Social Security office.

We conclude that while the evidence against Ndiaye was not overwhelming, there was sufficient evidence for a reasonable jury to find that Ndiaye was guilty of conspiracy. The jury obviously found Matar Fall to be credible, and credibility determinations are for a jury to make. See United States v. Andrews, 953 F.2d 1312, 1318 (11th Cir. 1992).

We also find that a reasonable jury could have found Sumbodo guilty of conspiracy beyond a reasonable doubt. It is true, as Sumbodo contends, that the strongest evidence he acted with knowledge of the conspiracy and with criminal intent is the testimony of Sasikin. Sumbodo has pointed to several problems with Sasikin's testimony. Sasikin testified that Sumbodo told him that Fall, the "Boss," made fake visas that the customers submitted with their Social Security applications, and which were later removed from the customers' passports. Sasikin also testified

47

that Sumbodo showed him one of the fake visas inside a customer's passport along with the genuine visa.

The Government claims that Sasikin's testimony was corroborated by other customers of Sumbodo, who testified that they knew their immigration status had expired, or that they did not obtain permission from immigration authorities to live and work in the United States. This testimony is evidence that Sumbodo was aware that the Social Security numbers were obtained with fraudulent immigration documents. Sumbodo's former roommate, Nugraha Wibisana, also testified that Sumbodo helped him illegally obtain a Social Security card. Wibisana also testified that Sumbodo told him to use the fraudulent I-94 card when he went to obtain a Georgia State Identification card. This is further evidence that Sumbodo acted with knowledge and intent during the conspiracy.

The evidence that Sumbodo knowingly and voluntarily joined the conspiracy may not be overwhelming, but it is sufficient to support the jury's guilty verdict on the conspiracy charge. The jury obviously chose to believe Sasikin and other witnesses. This testimony may have been inconsistent with some of the other evidence, but we have no reason to question the jury's credibility determinations.

(2) Count Twenty

Sumbodo next contends there was insufficient evidence to support his conviction on Count Twenty, which specifically alleges that he "encouraged and

48

induced" one specific alien, "I.N.S.A.J.," to reside in the United States by helping him fraudulently obtain a Social Security number. Sumbodo claims that I.N.S.A.J. was not identified by name in the indictment, he did not testify at trial, and there was no testimony about him.

Sumbodo also contends the evidence failed to prove that he encouraged or induced aliens to reside in the United States, as alleged in both Counts One and Twenty. He asserts that the Government failed to show any actual, potential or perceived relationship between immigration status and receipt of a Social Security number. While many aliens used Social Security numbers to secure employment while residing in the United States, those aliens had already entered the country. A Social Security card did not change anyone's status, and there was no evidence that anyone was "induced" to live here by obtaining such a card. Sumbodo contends that the use of Social Security numbers to secure employment does not constitute an encouragement or inducement "to enter and reside in the United States," in violation of 8 U.S.C. § 1324(a)(1)(A)(iv). Otherwise, any effort to assist an alien in living a better life during the alien's residence in this country would constitute a violation. Sumbodo alleges that the criminal statute must be strictly construed.

As for Sumbodo's conviction under § 1324, the Government contends that its evidence established that immigration status was directly tied to an alien's ability to lawfully obtain a Social Security number. In order to establish a criminal violation

of § 1324(a), the Government must prove beyond a reasonable doubt that the defendant (1) encouraged or induced the alien to reside in the United States (2) knowing or in reckless disregard that the alien's residence in the United States was in violation of the law. The Government contends that a reasonable trier of fact, when choosing among reasonable constructions of the evidence, could have found Sumbodo guilty of encouraging and inducing an alien to remain unlawfully in the United States when he fraudulently obtained a Social Security number for that alien.

The Government further alleges that Nathan Holmes, a Social Security Administration official who testified as an expert witness, confirmed that the Social Security Administration would not issue a Social Security number if it knew that information on the immigration documents-- such as the I-94 submitted in support of the application--was false. This testimony was corroborated by Agent Cabe. Although the Social Security numbers connected to this scheme were fraudulently obtained, therefore, they were accepted by prospective employers and used by aliens to obtain work.

The Government further notes that some alien customers testified they obtained Social Security numbers to facilitate their continuing residence in the United States. These individuals used the fraudulently obtained numbers for employment purposes. Some customers also testified they needed a Social Security number to get an apartment.

Regarding Sumbodo's argument there was no testimony at trial about the specific alien, I.N.S.A.J., with whom he was charged in Count Twenty of the indictment with encouraging and inducing to reside in the United States, the Government contends that an alien who obtained a card, Anantarisna, identified I Nyoman Surya Agus Jaya as his roommate. Jaya's application for a Social Security number was identified by Agent Cabe with Sumbodo's home address listed on it. There was also testimony that Jaya's immigration classification status did not entitle him to live and work in the United States or obtain a Social Security card. The Government notes, however, there was evidence that Jaya did work in the United States with the Social Security number he was issued.

Based on the foregoing, the Government alleges that a jury could reasonably have found beyond a reasonable doubt that Sumbodo was guilty of encouraging and inducing Jaya to reside in the United States in violation of the law by assisting him in obtaining a Social Security number, to which he was not entitled. There was sufficient evidence to establish that Jaya used the Social Security number so that he could remain and work in the United States. Accordingly, the Government contends that the jury's verdict finding that Sumbodo was guilty on Count Twenty was supported by sufficient evidence.

Sumbodo alleges that while there may be some correlation between the issuance of Social Security numbers and aliens employed in the United States, the act

51

of merely helping someone obtain a Social Security number cannot be construed as "encouraging or inducing" them to reside in this country in violation of the criminal statute. He contends, therefore, that the Government's "creative" argument should fail. Sumbodo notes that the Social Security cards obtained in this case were marked with the words, "VALID FOR WORK ONLY WITH INS AUTHORIZATION." Consequently, he claims the Social Security numbers had absolutely no effect on any alien's immigration status.

We conclude that there was sufficient evidence to support Sumbodo's conviction on Count Twenty. The applicable portion of the statute provides for criminal liability for any person who "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law." 8 U.S.C. § 1324(a)(1)(A)(iv). Sumbodo may not have encouraged or induced an alien to come to come to or enter the United States, but a jury could have found that he encouraged or induced an alien, namely Jaya, to reside in the United States, knowing it was in violation of the law. This violates the plain language of the statute.

Jaya was able to work in the United States because of the Social Security number he was issued. A jury could find that Sumbodo's assistance in helping Jaya obtain a Social Security card, which the evidence established he is not entitled to have, encouraged or induced him to reside in this country in violation of the statute.

52

In United States v. Oloyede, 982 F.2d 133, 135(4th Cir. 1992), one of the issues was whether a conviction under § 1324(a)(1)(A)(iv) was appropriate for a scheme which involved the falsifying of documents for citizenship applications, when those activities were directed solely to illegal aliens already residing in the United States. The Fourth Circuit observed that the scheme would allow those who received the fraudulent documents to obtain the benefits of citizenship, one of which was that they could work in this country without fear of detection and deportation. See id. at 137. It determined, therefore, that "[t]he selling of fraudulent documents and immigration papers under these circumstances constitutes 'encourages' as that word is used in the statute." See id. We agree with the Fourth Circuit's analysis, which is consistent with the plain language of the statute.

It is also worth noting that there is Eleventh Circuit authority which refers to a conviction for encouraging and inducing aliens to reside in the United States, in violation of § 1324(a)(1)(A)(iv), for conduct similar to that which is present in this case. In United States v. Kuku, 129 F.3d 1435, 1437(11th Cir. 1997), as part of conspiracy in which Social Security cards were unlawfully produced and sold to illegal aliens, the defendant had been convicted of encouraging and inducing aliens to reside in the United States, in violation of § 1324(a)(1)(A)(iv). The defendant, an employee of the Social Security Administration, would approve Social Security card applications for illegal aliens so that they could obtain employment, attend school or

receive government benefits. See id. at 1436-37. Although the propriety of the conviction was not at issue in Kuku, this Court has implicitly recognized that conduct which involved helping an illegal alien obtain a Social Security card to which he was not entitled so that he could work and live in this country was sufficient to support a conviction under § 1324(a)(1)(A)(iv).

We conclude that the jury's verdict finding Sumbodo guilty on Count Twenty was supported by substantial evidence.

E. Allegations of the Indictment (Sumbodo)

Sumbodo alleges that Section 1(B) of Count One of the indictment is so unintelligible that it failed to notify him of the offense charged. This section reads that Sumbodo and his co-defendants conspired to commit the following offenses:

> B. To willfully, knowingly and with intent to deceive the Commissioner of the Social Security Administration (the "Commissioner") of his true identity and the identity of another person, furnish and cause to be furnished false information to the Commissioner in connection with the establishment and maintenance of the records provided for in Section 405(c)(2) to Title 42, namely by applying for Social Security numbers using fraudulent immigration documents, in violation of Title 42, United States Code, Section 408(a)(6).

Sumbodo notes that pursuant to Federal Rule of Criminal Procedure 7(c)(1), an indictment must contain "a plain, concise and definite statement of the essential facts constituting the offense charged." Moreover, it must "set forth the elements of the offense in a manner which fairly informs the defendant of the charges against him and enables him to enter a plea which will bar prosecution for the same offense."

54

United States v. Elkins, 885 F.2d 775, 782 (11th Cir. 1989).  Sumbodo contends that because the allegation in Section 1(B) "makes no sense . . . [and] is incoherent," it fails to allege a criminal offense or to advise him of the substance of the charge.

The Government notes that this Court has held, "If an indictment specifically refers to the statute on which the charge was based, the reference to the statutory language adequately informs the defendant of the charge." United States v. Fern, 155 F.3d 1318, 1325 (11th Cir. 1998).  Moreover, the constitutional standard is fulfilled "by an indictment that tracks the wording of the statute, as long as the language sets forth the essential elements of the crime." United States v. Critzer, 951 F.2d 306, 308 (11th Cir. 1992) (citation omitted).  The Government contends that the relevant portion of the indictment basically tracked the statutory language of 42 U.S.C. § 408(a)(6).

A review of § 408(a)(6) reveals that the relevant portion of the indictment does track the language of § 408(a)(6).  Basically, the indictment reads that Sumbodo is charged with conspiring to deceive the Commissioner by applying for Social Security numbers using fraudulent immigration documents.  Sumbodo claims that this language in incoherent and unintelligible, but he does not explain how it is incoherent or unintelligible.  We find no error.

## VI. SENTENCING

### A. Ndiaye

Based on an adjusted offense level of 14 and criminal history category of I, Ndiaye's sentencing guideline range was 15 to 21 months. Ndiaye was sentenced to serve a term of 15 months imprisonment. He raises several issues on appeal.

#### (1) Obstruction of Justice

Ndiaye's adjusted offense level included an enhancement of two levels pursuant to U.S.S.G. § 3C1.1 for obstruction of justice. He appeals that adjustment. Section 3C1.1 provides:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

According to the presentence report, the probation officer recommended the adjustment because Ndiaye "had witnesses Aida Leye and Kaire Ndao submit false affidavits stating that they did not know the Defendant. However, Leye and Ndao testified at trial that they did know the defendant and that he had them submit the fraudulent affidavits." In determining that the enhancement was appropriate, the district court found that "the government has shown by a preponderance of the evidence that the defendant not only had two witnesses to submit false affidavits, which they did acknowledge during the trial of the case, but also the defendant and

56

his wife indirectly influenced Aida Leye to sign a false affidavit." Ndiaye contends that the district court clearly erred in applying this enhancement.

The Government has the burden of proving the applicability of guidelines that enhance a defendant's offense level. See United States v. Cataldo, 171 F.3d 1316, 1321 (11th Cir. 1999).

> Similarly, when a defendant challenges a factual basis of his sentence, the government has the burden of establishing the disputed fact by a preponderance of the evidence. The district court's factual findings for purposes of sentencing may be based on, among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing.

United States v. Polar, 369 F.3d 1248, 1255 (11th Cir. 2004) (citations and quotations omitted).

Ndiaye notes that the affidavits in question were prepared by defense counsel who submitted them by mail to prospective witnesses in order to determine those individuals' relationship with Ndiaye. The witnesses were first located and interviewed via telephone by defense counsel, not the Government. Defense counsel then, well in advance of trial, submitted these affidavits to the Government so as to explain the lack of a nexus between the affiants and Ndiaye. Ndiaye notes, moreover, that he did not introduce the affidavits in evidence so as to obstruct justice, nor did he use the affidavits to impeach witnesses called by the Government. It was the Government that introduced the affidavits.

Ndiaye alleges there was no effort by him or counsel to obtain or offer false

information or to obstruct justice in any way. The witnesses reviewed the affidavits and merely "filled in the blanks" themselves, or did so through the aid of someone interpreting for them. Ndiaye notes that the relevant question was phrased, "I know Amadou Fall Ndiaye as follows: (Please explain how you met Mr. Amadou Fall Ndiaye. If you do not know him or have never met him, please write in "do not know Amadou."). Counsel received these affidavits after they were filled in by the prospective witnesses. Because he believed they were pertinent to his case, counsel immediately turned the affidavits over to the Government, who used the addresses and phone number provided to contact the witnesses.

Ndiaye alleges that neither witness ever suggested she was instructed and/or encouraged to complete the affidavit improperly. When counsel for the Government inquired of Ndao as to whether she knew who Ndiaye was, Ndao responded, "I only met him the first time I came here but I really don't know him." After further questioning, it became apparent that Ndao had met Ndiaye in Atlanta when she stayed at his house. Ndao testified that no one directed her how to answer that question.

Ndiaye alleges that Leye, who had been hospitalized for psychiatric treatment in two separate hospitals during the week prior to her testimony, had great difficulty answering even simple questions, such as whether she could recognize the psychiatrist who was in the courtroom and who had examined her several days prior

58

to trial. Moreover, Leye testified her mind played tricks on her and that she sometimes heard voices. Leye also stated that she was on medication for her psychiatric condition and usually forgets things. She also testified that, contrary to her affidavit, she had in fact met Ndiaye during her visit to Atlanta.

Ndiaye alleges that Leye's testimony was not only contrary to her affidavit, but it was also contrary to what she had also told Agent Wright when he interviewed her. Ndiaye claims there is no evidence that he engaged in any obstructive conduct or was aware that anyone else had done so. As with Ndao, Leye simply completed a form prepared by Ndiaye's counsel with an answer she later said was false, just as she made statements to the agent that she later retracted. Ndiaye never told her or directed her how to answer the question on the affidavit.

Ndiaye emphasizes it was the Government that introduced the affidavits. At no point did Ndiaye or counsel reference the affidavits or attempt to mislead the court or the jury during the testimony of either witness. Ndiaye contends that it is apparent the witnesses answered the questions as they did on the affidavit because of the language and cultural differences, which explains the lack of clarity as to whether the witnesses "know" him. Leye's answers or lack of clarity can also be explained by her obvious confusion and psychiatric difficulties.

Ndiaye contends it cannot be true that in any case in which a witness changes testimony or in any way testifies inconsistently with a prior statement that obstruction

has occurred. Ndiaye asserts there is no evidence in the record that he suggested an answer to any question contained on the affidavit form. Assuming arguendo that obstructive conduct did occur, Ndiaye alleges that it was initiated by his wife and cannot be used to support the sentencing adjustment.

The Government notes that the application notes to the applicable guideline set forth a non-exhaustive list of examples of conduct to which the enhancement may apply, which includes intimidating and otherwise unlawfully influencing a witness; suborning perjury; producing or attempting to produce a false document during the course of a judicial proceeding; and providing a materially false statement to law enforcement. The Government alleges that the district court did not clearly err in finding that "the government has shown by a preponderance of the evidence that the defendant not only had two witnesses to submit false affidavits, which they did acknowledge during the trial of the case, but also the defendant and his wife indirectly influenced Aida Leye to sign a false affidavit."

The Government contends that prior to trial, Ndiaye argued the affidavits established that he did not know the customers whose Social Security cards were mailed to his salon. Consequently, he asked that the criminal charges against him be dismissed. However, the Government asserts that the affidavits were false and procured by Ndiaye, who contacted the witnesses and asked them to sign the false affidavits. The portions of the record cited by the Government indicate that it was

60

Ndiaye's wife, Assane, who contacted the witnesses about the affidavits. During the trial, the district court admitted Leye's and Ndao's affidavits as evidence of prior statements that contradicted their trial testimony as to whether they knew Ndiaye. The Government claims that at trial, both witnesses testified they did know Ndiaye. However, the record also shows that there was some confusion on the part of these witnesses as to what it means to "know" someone. The following evidence corroborated their testimony that they both knew Ndiaye: (1) both Ndao and Leye stayed in Ndiaye's home on their trip to Atlanta to obtain fraudulent Social Security numbers; (2) Ndiaye transported Leye back and forth to the airport; and (3) both Ndao and Leye had been picked up by Fall from Ndiaye's hair salon. Moreover, both witnesses identified Ndiaye in court. Finally, Ndiaye himself told Agent Cabe that he knew both women.

The Government contends neither witnesses' statements in their affidavits that they did not know Ndiaye were the result of "language and cultural differences," as alleged by the Appellant. The Government alleges Leye's husband, Hugo, told her to sign the affidavit stating that she did not know Ndiaye. Leye's husband is related to Ndiaye's wife. The Government claims this explains some of the pressure and stress exhibited by Leye when she was subpoenaed to testify. The Government notes that Leye testified her husband told her to sign the affidavit and the case would go away.

61

The Government also notes that Ndiaye sent Ndao an affidavit in which she falsely swore that she did not know him, when in fact she had stayed at his home when she came to Atlanta to buy her Social Security number. The Government contends that by providing false information and by unlawfully influencing two witnesses against him, Ndiaye qualified for the two-point enhancement for obstruction of justice. It is worth noting, however, that Ndao testified she was not told how to answer the question whether she knew him.

The Government alleges another basis for the obstruction enhancement is that Leye lied about knowing Ndiaye when interviewed by Agent Wright. According to the Government, this was a materially false statement to a law enforcement officer which significantly impeded the prosecution of the instant offense. The Government contends that Leye lied to the agent to cover up her earlier lie in the affidavit.

The Government next alleges that Ndiaye's attempt to intimidate and unlawfully influence Leye to not come to court to testify after she had been subpoenaed is the final basis for the obstruction of justice enhancement. This is based on testimony that Ndiaye's wife, Assane, called Leye after she was subpoenaed and told her not to testify. Ndiaye's wife allegedly told Leye, "If they tell you, just say that you went to Africa." The Government notes that the commentary to the guidelines provides that in order for the enhancement to apply, attempt is sufficient and contact can be direct or indirect. See U.S.S.G. § 3C1.1, comment. n.4(a).

Moreover, obstruction need not occur at trial. As the commentary provides, obstruction can occur during an official investigation.

The Government contends that the obstruction occurred when Ndiaye contacted Hugo and told him to have Leye execute the false affidavit. It continued when Leye felt compelled to lie to Agent Wright during investigation and preparation for trial because of the initial lie Ndiaye asked her to tell in the affidavit. The final act of obstruction was when Ndiaye's wife called and told Leye not to come to court after she was subpoenaed. The Government contends that because Ndiaye influenced two witnesses to make false statements in their affidavits, the district court did not clearly err in applying the two-level enhancement.

Ndiaye acknowledges that Leye and Ndao changed their affidavit answers during their testimony at trial as to whether they "knew" him. However, he alleges that the testimony of Ndao reveals she was not directed by anyone as to how to answer the questions on the affidavit. Moreover, Leye's testimony corroborated her answers in the affidavit that Ndiaye did not participate in assisting her with obtaining a Social Security number and card.

Ndiaye contends that the confusion regarding whether the witnesses knew him does not amount to obstruction of justice. Defense counsel prepared the affidavits, submitted them to the witnesses, received the completed affidavits and then turned them over to the Government before trial. Nothing in Ndiaye's behavior constituted

obstruction of justice. Moreover, because the Government failed to introduce evidence that he and his wife acted in concert, Ndiaye asserts that his wife's conduct cannot be used to support the enhancement. Ndiaye contends, therefore, that the enhancement should not apply and the case should be remanded for re-sentencing.[9]

We review a district court's finding that a defendant obstructed justice for clear error. See United States v. Singh, 335 F.3d 1321, 1323 (11th Cir. 2003). Based on the evidence presented at trial and at sentencing, we conclude that the district court did not clearly err. The fact that it was the Government, and not Ndiaye, that introduced the affidavits at trial is irrelevant for purposes of the guideline's application. Section 3C1.1 applies to obstruction of justice not only at trial and during sentencing, but also "during the course of the investigation." If Ndiaye instructed the witnesses to state they did not know him during the investigation, then there would be a valid basis for the two-level enhancement.

Even assuming the witnesses were confused by what it means to "know" someone, there is still a legitimate basis for the enhancement. Leye testified that she was told by her husband to sign the affidavit so "the case would go away." She stated that her husband was told by Ndiaye what to do with the affidavit so that "the case would go away." In determining that the adjustment was appropriate, the district

---

[9]Counsel for Ndiaye reiterates that he did not introduce the affidavits in evidence so as to obstruct justice, nor did Ndiaye use the affidavits to impeach any witnesses called by the Government. This was done by the Government. We do not suggest that counsel did anything improper.

64

court concluded that Ndiaye and his wife "indirectly influenced" Leye to sign the affidavit. That finding is supported by the record.

The district court could have also found that Ndiaye obstructed justice when his wife called Leye after she was subpoenaed and told her not to come testify. Assane Ndiaye allegedly told Leye to tell officials that she went to Africa. The application notes provide that the adjustment is appropriate for obstruction of justice which consists of "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1, comment. note 4(a).

We conclude that the district court did not clearly err in adjusting Ndiaye's base offense level upward two levels for obstruction of justice.

### (2) Number of Social Security Cards

Ndiaye also contends that the district court erred in applying a three-level adjustment to his base offense level, pursuant to U.S.S.G. § 2L2.1(b)(2)(A), based on the number of documents involved in the case. Ndiaye was held accountable for six Social Security cards. Ndiaye alleges that at most, he assisted or aided in the procuring of five documents, an amount of documentation not resulting in any upward adjustment. He notes that one of the Social Security numbers attributed to him was obtained by Matar Fall for Madjiguene Thiam. Ndiaye claims that the record establishes that Thiam had no involvement whatsoever with Thiam. Thiam never met

65

Ndiaye or came to his place of business. She could not identify him at trial. Ndiaye asserts that the only allegation involving the Thiam Social Security number which relates to him is that it was mailed to his place of business at 185 Mitchell Street.

Although Ndiaye argues that he handled no more than five of the six fraudulent Social Security cards mailed to his address, Fall testified that Ndiaye procured between ten and thirteen cards, and that Ndiaye's address was listed for the six fraudulently obtained cards "because it was [his] person." The district court found this testimony credible. Based on the evidence presented at trial, the district court did not clearly err in attributing more than five fraudulently obtained cards to Ndiaye.

### B. Sumbodo

Based on an adjusted offense level of 22 and a criminal history category of I, Sumbodo's sentencing guideline range was 41 to 51 months. Sumbodo was sentenced to serve a term of 44 months imprisonment. He raises several issues on appeal.

#### (1) Role in the Offense

Sumbodo first argues that he should not have received a four-level enhancement for an aggravating role, pursuant to U.S.S.G. § 3B1.1(a), asserting that he was just another person in the conspiracy and did not have an organizing or leadership role.

"This court reviews a sentencing court's determination of a defendant's role in

the crime for clear error." United States v. Ramsdale, 61 F.3d 825, 830 (11th Cir. 1995). Section 3B1.1(a) provides, "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." The commentary provides that in most instances, "the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." See U.S.S.G. § 3B1.1, comment. n.2. In assessing a defendant's role in the offense, the factors the courts should consider include:

> [1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. n.4. "There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." Id. "The mere status of a middleman or a distributor does not support enhancement under Section 3B1.1 for being a supervisor, manager, or leader. Section 3B1.1 requires the exercise of some authority in the organization, the exertion of some degree of control, influence, or leadership." United States v. Yates, 990 F.2d 1179, 1182 (11th Cir. 1993).

Sumbodo does not dispute that the conspiracy involved five or more participants or was otherwise extensive. Instead, he argues that he was a mere "intermediary between Matar Fall and the Indonesian applicants." Sumbodo contends

that he was "a cog in the wheel, just like Mr. Sasikin, just like Mr. Soeryanto." However, the record reflects that Sumbodo exercised authority over the organization by recruiting and instructing co-conspirators such as Soeryanto and Sasikin. Even though others may have had a larger role in the conspiracy, there was sufficient evidence to support the district court's imposition of a four-level aggravating role enhancement. Accordingly, the district court did not commit clear error.

### (2) Profit Motive

Sumbodo contends that he should have received a three-level reduction, pursuant to U.S.S.G. § 2L1.1(b)(1), because he did not act for profit, and the Government redacted the language in the indictment claiming that the criminal activity was for profit. Sumbodo alleges that he did not profit from the conspiracy, and the fact that the testimony showed that Fall charged Sumbodo less than Sumbodo charged his customers, thereby suggesting a profit motive for Sumbodo, was invalid because Fall lied about the amounts he received.

According to the transcript, it appears the Government only redacted "in exchange for money" out of certain counts in the indictment, including Count Twenty. Count Twenty applied to Sumbodo, charging him with encouraging and inducing a particular alien to reside in the United States, in violation of the law. The district court did not clearly err as to its finding that profit remained at issue as to the conspiracy charge in Count One. Based on the evidence of profit motive presented

68

at trial, the Government notes it argued to the jury that Sumbodo profited from his activity in the conspiracy.

While there may be more than one permissible way to view the evidence concerning profit, the district court's choice between permissible views cannot be clear error. See Johansen v. Combustion Engineering, Inc., 170 F.3d 1320, 1335 n.30 (11th Cir. 1999). Because there was evidence that Sumbodo profited, the district court did not err in declining to apply a three-level downward departure.

### (3) Application of U.S.S.G. § 2L2.1

Sumbodo argues that his base offense level should have been 11 pursuant to U.S.S.G. § 2L2.1, because that guideline is more appropriate to the offense in that it specifically addresses trafficking and false documents, rather than 12 pursuant to § 2L1.1, which relates to smuggling and harboring aliens. Sumbodo contends that this case is "essentially about false documents and statements, not smuggling or harboring aliens."

Whether a particular guideline applies to a given set of facts is a question of law subject to de novo review. See Kirkland, 985 F.2d at 537. According to the guidelines, in the case of counts grouped together, the applicable offense level is the offense level for the most serious count, i.e., the highest offense level in the group. See U.S.S.G. § 3D1.3(a); United States v. Marseille, 377 F.3d 1249, 1254 (11th Cir. 2004).

Sumbodo was convicted on three counts, including encouraging and inducing aliens to reside illegally in the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv). Pursuant to U.S.S.G. § 3D1.2(b), Sumbodo's convictions were grouped because all offenses involved transactions connected by a common criminal objective and constituted part of a common scheme or plan. The base offense level for the conspiracy was determined to be 12 pursuant to U.S.S.G. § 2L1.1, based on the base offense level for the most serious offense for which Sumbodo was convicted, which was the § 1324(a)(1)(A)(iv) violation. See U.S.S.G. App. A. Thus, the district court correctly applied § 2L1.1 to determine Sumbodo's base offense level.

### C. "Booker" Arguments

Ndiaye, Sumbodo, and Aimasiko[10] each argue that the district court violated their Sixth Amendment rights in applying various enhancements because the facts supporting the enhancements were neither admitted by the Appellants nor found by a jury. The Appellants based their arguments on Blakely v. Washington, 542 U.S. 296, 303-04, 124 S. Ct. 2531, 2537-38 (2004). After the briefing in this case was completed, the Supreme Court, in United States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 755-56 (2005), extended its holding in Blakely to the federal sentencing guidelines. The Appellants supplemented their briefs on the basis of Booker.

---

[10]Based on an adjusted offense level of 16 and criminal history category of I, Aimasiko's sentencing guideline range was 21 to 27 months. He was sentenced to serve a term of 21 months imprisonment.

Because the Appellants did not argue about the constitutionality of the guidelines generally or as applied to them before the district court, we review the present claims for plain error. See United States v. Duncan, 400 F.3d 1297, 1301 (11th Cir. 2005). An appellate court may only correct such an error if it affects a defendant's substantial rights. See United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005). In determining whether the error affected a defendant's substantial rights, "we ask whether there is a reasonable probability of a different result if the guidelines had been applied in an advisory instead of binding fashion by the sentencing judge." Id. at 1301. Because we do not know whether there would have been a different result under an advisory guidelines system, the Appellants cannot meet their burden. See id. Accordingly, their Booker arguments are without merit.

## VII. CONCLUSION

Upon a review of this extensive record and upon consideration of the parties' briefs, we discern no reversible error.

**AFFIRMED.**

71