[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-10249
Non-Argument Calendar
_____

D.C. Docket No. 4:16-cr-10007-JEM-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CESAR MACARIO MARTINEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(September 5, 2017)

Before HULL, WILSON, and MARTIN, Circuit Judges.

PER CURIAM:

Cesar Macario Martinez appeals his conviction for conspiracy to transfer false identification documents in violation of 18 U.S.C. § 1028(f).  Martinez argues the district court erred by denying his motion for acquittal under Federal Rule of Criminal Procedure 29 because there was insufficient evidence to sustain his conviction.  After careful review, we affirm.

I.

A federal grand jury charged Martinez and three codefendants with conspiracy to transfer false identification documents in violation of 18 U.S.C. § 1028(f) (Count One), and two counts of transferring false identification documents in violation of 18 U.S.C. § 1028(a)(2) (Counts Five and Six). Martinez's three codefendants were Nehemias Samayoa Corado, Yamilet del Carmen Selva, and Nery Castillo Rivera ("Castillo").  Corado, del Carmen Selva, and Castillo all pled guilty to Count One.  Martinez pled not guilty and went to trial.

At trial, the government called Natalie Diaz—an immigration officer with the United States Citizenship and Immigration Services—to testify.  Diaz authenticated immigration documents that Martinez had filed, and the government entered those documents into evidence and pointed out his signature on two pages. The government then showed Diaz the California Department of Motor Vehicles records for Martinez (including his driver's license), and Diaz identified Martinez

as he appeared in the courtroom as the person in those records.  The copies of Martinez's driver's license showed his signature and listed him as five feet two inches tall.  The government also entered copies of codefendant Castillo's driver's license into evidence.  Those copies listed Castillo as five feet eight inches tall.

Next, the government called Amparo Cruz to the stand.  Cruz testified she had signed up to act as a confidential source for the Department of Homeland Security ("DHS") in exchange for immigration benefits in 2011.  She said she spoke to Castillo on the phone from 2014 through March 2015 about buying false identification documents from him.  After entering into evidence transcripts and tapes of some of their calls, the government played the tapes.  Cruz testified that she was speaking to Castillo in the tapes and that she was trying to obtain six sets of false documents at DHS's behest.  Cruz also said she exchanged text messages with Castillo, copies of which were entered into evidence.  She explained that Castillo sent her a text message instructing her to send money and photographs of the people for whom she wanted false documents to a "Cesar Ovidio Macario Martinez" at a particular address.  After the photographs were mailed to that address, Castillo sent Cruz a text message confirming he had received the photographs.

Cruz admitted she never met or spoke to Martinez, but said Castillo instructed her to mail the photographs to Martinez because he was a "trusted

person" with whom Castillo worked. She said Castillo told her to send money for the false documents to his "friend" via MoneyGram. Cruz said she paid $1,600 for the set of false documents. She also explained that she asked Castillo over text message if the address to which the photographs were sent belonged to him or to Martinez. Castillo told her it was his house. Cruz then said she gave Castillo the reference number that was needed to collect the money she sent via MoneyGram. When she gave Castillo the address where the false documents she had purchased should be sent, he responded "I will send them to you tomorrow."

Next, the government called Julio Santiago, a United States postal inspector, to the stand. Santiago said he became involved in this case in 2014 when a DHS agent contacted him and asked him to coordinate a controlled delivery in California. Santiago authenticated a copy of a mail label he had written for the controlled delivery showing "Cesar Ovidio Macario Martinez" as the recipient and 925 West Denni Street, Apartment 1, Wilmington, California as the address. After the government entered the label into evidence, Santiago testified that he prepared a package (with the label included) and sent it to his counterpart, Inspector Christine Reins-Jarin, in California. Although Santiago was not in California for the controlled delivery, he received return packages from California in the undercover PO box he had set up for the operation. Santiago identified one of the return packages as a priority mail envelope and an inner envelope that was sent on

4

March 9, 2015. The sender listed on the envelope was "Cesar Macario," and the return address was 3738 South Vernon Avenue, Los Angeles, California. Then, Santiago identified another envelope and inner envelope that were sent from California to the PO box on March 16, 2015. That envelope stated it was from "Nery Rivera" at the same address. Santiago testified there were permanent resident cards and social security cards inside both of these packages. He also said the envelopes were purchased with a credit card with the last four digits 2877, which belonged to "Nery O. Castillo."

The government proceeded to call Reins-Jarin, Santiago's counterpart in Los Angeles, to testify. Reins-Jarin said she conducted the controlled delivery dressed as a postal carrier. She testified that she brought with her a PS Form 3849 (the form that a recipient signs upon delivery of an item), and the government entered that form into evidence. The signed form contained a signature that appeared to belong to Martinez. Reins-Jarin said she delivered a package addressed to Cesar Ovidio Macario Martinez at 925 West Denni Street, Apartment 1 in Wilmington, California on February 27, 2015. As she was walking up the stairs toward Apartment 1, a man standing outside of the apartment called out to her and asked if she had an item for "Cesar Martinez." Reins-Jarin testified that she approached the man, handed him the envelope, and asked him to sign the PS Form 3849. Reins-Jarin explained that she was later asked if she could identify the man and that she

5

could not positively identify him.  Before the delivery, she was shown a picture of Castillo.  Then, after the delivery, she was shown another picture of Castillo and a picture of Martinez.  She testified that the individual outside the apartment "appeared to resemble more of Nery Castillo if I had to pick."  However, she stated the man was slightly shorter than her height (five feet four inches).  She said "I know that he was not taller than me," and explained that she was not wearing heels that day.

The government then called Willard Hart, a custodian of records for MoneyGram, to the stand.  Hart testified that MoneyGram is a money transfer and payment-services company similar to Western Union.  He explained that to send a MoneyGram, a sender fills out a form, provides the money to be sent and the fee for sending it, and gets an eight-digit reference number that the recipient of the money must enter in order to pick up the money.  The recipient must then go to a MoneyGram location, fill out a receipt form with his name, give the reference number and the amount he is expecting, and provide an ID and an address.   He also noted that any transaction of $900 or more requires the recipient to enter his ID information into the MoneyGram computer system.  The government then showed Hart a MoneyGram receipt form, a receipt, and a copy of the state ID that was used to pick up a particular MoneyGram transfer.  The government entered these records into evidence.  The receipt form showed a signature ostensibly

belonging to Martinez.  Hart testified that according to these records, the person who received the MoneyGram was "Cesar Macario Martinez," his address was 925 West Denni Street, Apartment 1, Wilmington, California, and his phone number was 310-709-8006.   Further, the amount received was $1,600, and the recipient signed the receipt form on March 3, 2015.  Hart noted that the money was picked up at Ace Cash Express in Wilmington, California.  He also explained that (1) the records of that transaction contained a copy of the ID used to pick up the money; (2) the ID that was used belonged to "Cesar Ovidio Macario Martinez"; and (3) the address listed on the ID was 914 North Fries Avenue A, Wilmington, California. Then, Hart confirmed that (1) the address on the MoneyGram receipt form (925 West Denni Street) was the same as one of the addresses listed for Martinez in his California Department of Motor Vehicles records; and (2) the address on the ID that was used to pick up the $1,600 (914 North Fries Avenue A) matched another address listed for Martinez in his Department of Motor Vehicles records.

The government then submitted several stipulations into evidence.  The parties stipulated that (1) no fingerprints were found on the false identification documents; (2) telephone records showed that the 310-709-8006 number from the MoneyGram transfer records was listed as belonging to Cesar Martinez; (3) another number, 323-707-5066 was listed to Nery O. Castillo; and (4) 41 calls were exchanged between these two numbers in February 2015—including two

7

calls on February 27—and 18 calls were exchanged between the numbers from March 1, 2015 to March 17, 2015.

Martinez then moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29.  He argued the evidence showed that only Castillo was involved in the transfers of documents, and that there was no evidence that Martinez willfully entered into an agreement with anyone in the conspiracy.  The district court denied Martinez's Rule 29 motion.  After resting his case, Martinez renewed his motion for acquittal, and the district court again denied the motion.

The jury found Martinez guilty of conspiring to transfer false identification documents (Count 1), but not guilty of actually transferring such documents (Counts 5 and 6).  The district court then sentenced Martinez to 12-months imprisonment followed by a 3-year term of supervised release.

## II.

On appeal, Martinez argues there was not enough evidence to show that he was knowingly involved in the conspiracy between his three codefendants.  We review de novo the sufficiency of evidence to support a conviction, "viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict."  United States v. Taylor, 480 F.3d 1025, 1026 (11th Cir. 2007).  Thus, we will uphold a district court's denial of a motion for judgment of acquittal unless no reasonable trier of

fact could conclude that the evidence established the defendant's guilt beyond a reasonable doubt.  See id.  "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt . . . ."  United States v. Young, 906 F.2d 615, 618 (11th Cir. 1990).  "A jury is free to choose among reasonable constructions of the evidence."  Id. at 619.

18 U.S.C. § 1028(a)(2) makes it illegal to knowingly transfer a false identification document with knowledge that it was produced without lawful authority.  And under 18 U.S.C. § 1028(f), it is illegal for any person to attempt or conspire to commit any offense under § 1028.  To convict someone of conspiracy, the government must show with proof beyond a reasonable doubt that (1) a conspiracy existed; (2) the defendant knew about the conspiracy; and (3) he knowingly joined the conspiracy.  United States v. Garcia-Bercovich, 582 F.3d 1234, 1237 (11th Cir. 2009).  The government can satisfy the knowledge requirement by showing that the defendant was aware of the "essential nature of the conspiracy."  United States v. Ndiaye, 434 F.3d 1270, 1294 (11th Cir. 2006).  Mere presence at the scene of a crime or close association with a co-conspirator does not establish knowing participation, but knowledge can be established through the "surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy."  United States v. Vera, 701 F.2d

9

1349, 1357 (11th Cir. 1983).  In other words, agreement and knowing participation in the conspiracy can be inferred from circumstantial evidence.  United States v. Prince, 883 F.2d 953, 957 (11th Cir. 1989).

In this case, viewing the evidence in the light most favorable to the government, there was enough for a reasonable jury to find Martinez guilty beyond a reasonable doubt of conspiring to transfer false identification documents.  See Taylor, 480 F.3d at 1026.   The government only needed to demonstrate that a conspiracy to transfer false identification documents existed; that Martinez knew about the conspiracy; and that he knowingly joined the conspiracy.  See 18 U.S.C. §§ 1028(a)(2), (f); Garcia-Bercovich, 582 F.3d at 1237.  Martinez does not dispute that a conspiracy to transfer false identification documents existed.  Neither does he dispute that Castillo was part of that conspiracy.  Thus, the only question on appeal is whether there was enough evidence to show Martinez knew about and willingly joined the conspiracy.

The circumstantial evidence presented to the jury suggests that Martinez was aware of the essential nature of the conspiracy and committed acts that furthered the conspiracy's purpose.  See Ndiaye, 434 F.3d at 1294; Prince, 883 F.2d at 957; Vera, 701 F.2d at 1357.  The stipulations show that Martinez exchanged nearly 60 phone calls with Castillo in February and March of 2015, which indicates at the very least that Martinez knew and was in frequent contact with Castillo during the

10

relevant time frame of the alleged conspiracy. Even though Cruz said she never actually spoke to Martinez, she testified that Castillo told her to send money to Martinez and referred to Martinez as a "trusted person" with whom he worked. The address on the package that Santiago sent to California posing as Cruz matched an address for Martinez in his California Department of Motor Vehicles records. And although Reins-Jarin testified that she could not identify the man to whom she delivered the package during the controlled delivery and that she thought the man bore a greater resemblance to Castillo, she also said she was sure that the man was shorter than she was. Martinez's driver's license says he is five feet two inches tall—shorter than Reins-Jarin's five feet four inches—while Castillo's license says he is five feet eight inches tall. Viewed in the light most favorable to the government, this evidence could lead a reasonable factfinder to conclude that Martinez was the one who received the package containing the photographs the co-conspirators needed to create the false identification documents.

Further, Cruz testified that she sent $1,600 for the documents to Martinez via MoneyGram, and Hart said the $1,600 MoneyGram was picked up in Wilmington, California by a person who (1) claimed to be Martinez; (2) was in possession of a driver's license belonging to Martinez; (3) gave an address that matched Martinez's; (4) gave a phone number that was listed for Martinez; and (5)

signed Martinez's name.  A reasonable factfinder could conclude from this evidence that Martinez was the one who picked up the money for the documents. And lastly, all of the evidence against Martinez is bolstered by the fact that the government's exhibits show that Martinez's uncontested signatures on both his immigration documents and his driver's licenses appear similar to the signatures on the MoneyGram receipt and on the package delivery slip from the controlled delivery.

All of this evidence, construed in the light most favorable to the government, provided a sufficient basis for a reasonable jury to find that Martinez was aware of the nature of the conspiracy and acted in furtherance of it.  See Young, 906 F.2d at 618.  Thus, the district court did not err in denying Martinez's Rule 29 motion for judgment of acquittal.

**AFFIRMED.**